# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 2, 2010

## KARDIUS WILKES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-27220     John T. Fowlkes, Jr., Judge**

---

**No. W2009-01476-CCA-R3-PC  - Filed August 18, 2010**

---

The Petitioner, Kardius Wilkes, was convicted by a jury of one count of first degree murder. This Court affirmed his conviction on direct appeal, and his application for permission to appeal was denied by the Tennessee Supreme Court. See State v. Kardius Wilkes, No. W2001-02172-CCA-R3-CD, 2002 WL 818255 (Tenn. Crim. App., Jackson, Apr. 26, 2002), perm. app. denied (Tenn. Oct. 7, 2002). He later filed a petition for post-conviction relief. Following an evidentiary hearing, the post-conviction court denied the Petitioner relief. In this appeal, the Petitioner contends that the post-conviction court erred in denying him relief because his trial counsel failed to: (1) impeach a particular witness using transcripts of the Petitioner's first trial, which ended in a mistrial; (2) adequately meet with the Petitioner before his second trial; (3) call the Petitioner's brother as a witness; and (4) adequately investigate and interview potential witnesses. After our review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

R. Andrew Hutchinson, Memphis, Tennessee, for the appellant, Kardius Wilkes.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rachel Newton, Assistant District Attorney General,  for the appellee, State of Tennessee.

# OPINION

## Factual Background

We summarized the facts of the Petitioner's case on direct appeal as follows:

On January 12, 2000, several residents of Watkins Manor Apartments in Frayser were barbequing outside their apartments when the Appellant and Nicholas Russell drove up and parked their vehicle. Witnesses watched as the [Petitioner] and Russell approached the victim. The [Petitioner] struck the victim, Alexander King, in the head with a pistol and exclaimed, "I told you about ya'll [Vice Lords] selling drugs over here in this neighborhood." After the [Petitioner] struck the victim with the handgun, the victim began running. The [Petitioner] chased the victim into a driveway. The [Petitioner] leveled his pistol at the victim, fired one shot and missed. As the victim continued running, the [Petitioner] fired a second shot from a distance of approximately fifteen feet and the victim fell to the ground. The fatal gunshot struck the victim in the back of the head. The [Petitioner] and Russell returned to their vehicle and drove away. Officers were called to the scene around 8:45 p.m. and found no weapons on the victim.

In his statement to police, the [Petitioner] described the events preceding the murder and the murder itself as follows:

Me and Nicholas Russell was riding through Watkins Manor Apartments and we had saw Mr. King [the victim] and then at that time we went back to Nicholas house in the Watkins Manor Apartments. Nick had went upstairs and got the gun, he brought it back down and gave it to me. We went back around where we saw [the victim] at and I guess [the victim] didn't notice me cause we had an incident where he had took something from me. He took some money from me about a couple of months ago. This was our first confrontation since he took the money. Nick had got into it with [the victim] about something, but I don't know what it was about and Nick told [the victim] not to come back in the Watkins Manor. When [the victim] walked up he didn't see me but Nick was talking to him. Nick was like saying, "Give me some money, give me something out of your pocket", and then I hit [the victim] with my hand, [the victim] took off running. Then Nick and me chased him and then Nick said, "shoot at him", and then I shot two times to try and scared him and he was running. He took a couple of

-2-

more steps and then he fell. After, I saw him fall, me and Nick jumped in the car and rode off . . . I got up at about 3:30 a.m. . . . and I stopped right there at the Wolf River and I got out, slung the pistol over the side . . . . I didn't try to kill him and I didn't try to rob him. I just was trying to show him that you don't do folks wrong and get away with it. I didn't mean to shoot him anywhere . . . I was just trying to scare him.

A witness at the scene, Aaron Taylor, also recalled briefly seeing the [Petitioner] arrive at the apartment complex and leave prior to his return twenty minutes later. The [Petitioner] did not testify at trial.

State v. Kardius Wilkes, No. W2001-02172-CCA-R3-CD, 2002 WL 818255, at *1-*2 (Tenn. Crim. App., Jackson, Apr. 26, 2002) (footnote omitted).

At his post-conviction hearing, the Petitioner relayed his version of the events underlying his conviction, explaining that he had merely been trying to break up a fight between Mr. Russell and the victim. When the victim ran, the Petitioner fired his gun into the air intending to scare the victim but instead accidentally shot him to death.

Regarding the performance of his trial counsel, the Petitioner said that trial counsel's failure to order transcripts of his first trial resulted in the inability to properly impeach witnesses at his second trial. The Petitioner said that, at his first trial, witness Aaron Taylor testified that he had removed money and a beeper from the victim's body; the Petitioner said this established that Mr. Taylor could also have removed a gun from the victim's body and given it to the victim's brother, who was later arrested with a gun in his possession. The Petitioner said that, at the second trial, Mr. Taylor denied removing any items from the victim's body. The Petitioner added that, at the first trial, Mr. Taylor testified that the victim was relatively far away from the Petitioner when he was shot; at the second trial, Mr. Taylor said the victim was much closer. The Petitioner said trial counsel did not notice these discrepancies and did not impeach Mr. Taylor even after the Petitioner asked him to do so.

The Petitioner also testified that he had never fired a gun before shooting the victim, and requested an expert witness for the purpose of establishing how difficult it would have been for him to make the fatal shot intentionally; trial counsel had responded that an expert would not be worthwhile. In addition, the Petitioner had wanted his brother, Nicolas Russell, to testify on his behalf; trial counsel did not call Mr. Russell as a witness.

Regarding his preparation for trial, the Petitioner said trial counsel only met with him three or four times in jail. He also met with the Petitioner during court proceedings before

-3-

the actual trial. Each of these meetings lasted only five to ten minutes. He also said that trial counsel seemed less attentive and asked fewer questions of witnesses during the second trial.

Mr. Russell testified at the post-conviction hearing that he was with the Petitioner during the events that resulted in the victim's death. He said that the victim had a chrome nine millimeter handgun tucked into his pants during the encounter that preceded the shooting. He believed the victim displayed the gun in order to frighten Mr. Russell and the Petitioner. The victim never drew the gun. Mr. Russell said he told trial counsel that he saw the victim in possession of a gun. He acknowledged on cross-examination that he told the police, in an interview about a week after the incident, that he did not know whether the victim had been armed.

Trial counsel also testified. He said that he met with the Petitioner on many occasions, including at least six meetings before the first trial and additional meetings before the second trial.

Regarding the Petitioner's and Mr. Russell's claim that the victim had a gun, trial counsel noted that Mr. Russell only told him that he "believe[d] the victim had a gun." Mr. Russell never said he had seen a gun. Trial counsel chose not to call Mr. Russell as a witness because every other witness testified that the victim was not armed. Trial counsel also noted that every other witness said Mr. Taylor had not taken anything from the victim's body and therefore could not have removed a gun.

Trial counsel said that a firearms expert might have been helpful; he chose not to hire one because he was not sure whether the trial judge would have allowed it. He also said that an expert might have been damaging, however, in that the expert might have established the unlikely nature of the Petitioner's claim that he had shot the victim while trying to fire into the air over the victim's head. Trial counsel noted that he spoke to a number of people who had been in the area at the time of the shooting; all of them said they had not been able to hear whether the victim and the Petitioner argued, and did not know what had happened before shots were fired. He did not hire an investigator to interview witnesses. Trial counsel also noted certain ways in which the Defendant's statement differed from his claim that he was merely breaking up a fight between the victim and another person, in that the Petitioner admitted that the victim had stolen money from him and was a rival gang member.

The post-conviction court denied the Petitioner relief. He now appeals.

**Analysis**

To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58 (1985). The prejudice component is modified such that the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have

insisted on going to trial." Id. at 59; see also Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

**I. Failure to Impeach Aaron Taylor**
The Petitioner first contends, based on his claim that Mr. Taylor's testimony at the Petitioner's first trial differed from his testimony at the Petitioner's second trial, that trial counsel was deficient in failing to impeach Mr. Taylor. This issue does not appear in the Petitioner's petition for post-conviction relief; it is therefore waived. See Tenn. Code Ann. § 40-30-104(d) (stating that "[t]he petitioner shall include [in the petition for post-conviction relief] all claims known to the petitioner for granting post-conviction relief and shall verify under oath that all the claims are included"). Although the post-conviction court accordingly did not specifically address this issue in its order denying post-conviction relief, we note that the post-conviction court found that Petitioner failed to prove his factual claims by clear and convincing evidence. We also note that the Petitioner did not introduce transcripts of his trials in order to show that Mr. Taylor's testimony differed between the first and the second trials. The Petitioner is not entitled to relief on this issue.

**II. Failure to Adequately Meet with the Petitioner**
Trial counsel testified that he met with the Petitioner at least six times before his first trial and a number of times before his second trial. The post-conviction court credited his testimony rather than the Petitioner's, and the evidence does not preponderate against this

factual finding. While the Petitioner correctly notes that the meetings before his first trial do not necessarily establish that he was prepared for his second trial, they were certainly pertinent to the second trial in that the evidence being presented against the Petitioner was nearly identical. Additionally, the Petitioner has not identified any specific way in which he believes he was not prepared for trial or unable to participate in his own defense. This issue is without merit.

### III. Failure to Call Nicolas Russell as a Witness

The post-conviction court credited trial counsel's testimony that Mr. Russell never claimed to have seen a gun in the victim's possession. That being so, trial counsel's decision not to allow him to testify that he merely believed the victim to be armed was reasonable in terms of trial strategy. All of the other witnesses at trial testified that the victim did not have a gun, and no gun was found on the victim's person. Mr. Russell's belief that the Petitioner was armed would have done little to establish the threat that he and the Petitioner claimed to perceive. The post-conviction court noted that Mr. Russell's credibility was "terrible." The post-conviction court found that trial counsel's performance was not deficient for electing not to call Mr. Russell as a witness. We agree. This issue is without merit.

### IV. Failure to Interview Potential Witnesses

The evidence does not preponderate against the post-conviction court's finding that trial counsel interviewed other people who were at the scene at the time of the shooting. The Petitioner contends that trial counsel should have hired a private investigator to do the same. The Petitioner presented no evidence that trial counsel's investigation was deficient in any way, or that any other favorable evidence would have been uncovered had a private investigator attempted the same task. The post-conviction court found that trial counsel's performance was not deficient in this respect. We agree. This issue is without merit.

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
DAVID H. WELLES, JUDGE